Shirley Rockwell, Appellant, *v.* Pennsylvania State Horse Racing Commission and Continental Racing Association, Appellees.

Argued June 3, 1974, before President Judge Bow-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Arthur L. Goldberg,* with him *Ronald M. Katzman* and *Goldberg, Evans & Katzman,* for appellant.

*Henry L. Rossi,* with him *James F. Cedoma,* for appellees.

OPINION BY JUDGE BLATT, October 17, 1974:

On December 19, 1973, while Shirley Rockwell (Ms. Rockwell), was a patron at the Liberty Bell Park race-

track in Philadelphia, where the Continental Thoroughbred Racing Association, Inc. (Association), was conducting its thoroughbred race meeting, she was requested by the Association's security employees to leave the premises and advised that she would be denied reentry in the future. She left as requested, and, when her attorney later protested, she was advised by the Association's letter of January 9, 1974 that her ejection and exclusion were based upon the Association's "right to exclude any person from the premises . . . so long as that exclusion is not violative of any specific statutory or constitutional provision." On January 14, 1974, objecting to the lack of a hearing prior to the Association's action, Ms. Rockwell filed a direct appeal with this Court and also asked for supersedeas. The Association then filed a motion to dismiss the appeal, contending that its action was not appealable.[1]

On January 31, 1974, this Court granted the appellant's request for supersedeas and directed the parties to argue the Association's motion to dismiss her appeal. The following question, therefore, is now presented for our determination: What right, if any, did the Association have to eject or exclude Ms. Rockwell without affording her a hearing?

At common law, a person who was engaged in a public calling, such as an innkeeper or a common carrier, was held to be under a duty to the general public and was obligated to serve, without discrimination, all who sought service. *Horney v. Nixon*, 213 Pa. 20, 61 A. 1088 (1905). On the other hand, proprietors of private enterprises, such as places of amusement and resort, enjoyed the right to serve whomever they might please.

---

[1] Ms. Rockwell's appeal was also extended to any attendant action of the Pennsylvania State Horse Racing Commission, and on January 18, 1974 the Commission likewise filed a motion to dismiss. Action upon that motion has been deferred pending disposition of the Association's motion.

*Horney, supra.* That right has been made subject now, of course, to civil rights statutes which prohibit the exclusion of persons from all places of public accommodation when such exclusion is based solely on the race, creed, color, or national origin of the persons seeking admission.

Here the Association argues that, absent statutory or constitutional provisions specifically to the contrary, such as civil rights statutes, the common law right of private proprietors to eject or exclude would attach to operators of private racetracks just as it did to a theater operator in *Horney, supra.* The Association has not cited any precedents in this Commonwealth, nor have we found any. The Association asserts, however, that courts of other jurisdictions have held that the doctrine advanced in *Horney, supra,* does apply to racetrack operations. *Epstein v. California Horse Racing Board,* 222 Cal. App. 2d 831, 35 Cal. Rptr. 642 (1963) ; *Garifine v. Monmouth Park Jockey Club,* 29 N.J. 47, 148 A. 2d 1 (1959) ; *Madden v. Queens County Jockey Club,* 296 N.Y. 249, 72 N.E. 2d 697 (1947).

Clearly if the common law doctrine does apply, an ejected racetrack patron merely has an action in contract, based on the purchase of the entrance ticket, for return of the admission price and no more. *Marrone v. Washington Jockey Club of the District of Columbia,* 227 U.S. 633 (1913). At least one commentator, however, has seen fit to argue that "[i]t might seem logical to conclude that the legal privilege of arbitrary expulsion of customers should be abolished." Conrad, *The Privilege of Forcibly Ejecting an Amusement Patron,* 90 U. of Pa. L. Rev. 809, 819 (1942). This commentator points out that the doctrine is based only upon the notion that a patron has nothing more than a revocable license and has no property right in his seat. A property right, it is argued, can be given only by deed. *See Marrone v. Washington Jockey Club of the District of*

*Columbia, supra.* Yet, the commentator adds, it strains the modern sense of justice to suggest that one has no right to a seat if he has no deed. As in fact, our own Supreme Court has postulated in a case regarding theater seats, "as purchasers and holders of tickets for particular seats they [the patrons] had more than a mere license. Their right was more in the nature of a lease, entitling them to peaceable ingress and egress, and exclusive possession of the designated seats during the performance on that particular evening." *Drew v. Peer,* 93 Pa. 234, 242 (1880). Such a position is especially compelling where, as in the instant case, a Commonwealth license virtually permits the existence of the amusement in question as a regulated monopoly. The public's access to this form of entertainment, therefore, is limited by the Commonwealth itself, and a patron would consequently seem entitled to the utmost protection. And as was held in a recent New York case, "the combined force of the factors establishing State involvement" in racetrack operations can be so great as to require the treatment of those operations as state actions subject to due process requirements, thus removing the common law defense of an absolute right to exclude otherwise available to a privately owned amusement operation. *Jacobson v. New York Racing Association, Inc.,* 41 A.D. 2d 87, 341 N.Y.S. 2d 333 (1973).[2]

---

[2] The court has not overlooked the fact that in *Jacobson, supra,* the operation of the racing association was found to be state action whereas in *Madden v. Queens County Jockey Club,* 296 N.Y. 249, 72 N.E. 2d 697 (1947), a similar operation was not found to be state action. Among the distinctions drawn by the New York court was the fact that in the former case the association was a franchisee of the state and the latter a licensee. We note that the appellee Association herein operates pursuant to a license granted by the Commonwealth of Pennsylvania rather than a franchise. Act of December 11, 1967, P. L. 707, 15 P.S. §2653. We caution, however, that this distinction alone may not suffice to delineate for constitutional purposes the extent of state involvement in horse-racing operations.

Whether or not the common law rule may any longer be applicable in a situation such as this, however, an examination of the Pennsylvania Thoroughbred Horse Race Meeting Corporation Act, Act of December 11, 1967, P. L. 707, *as amended,* 15 P.S. §2651 et seq., indicates that we really need not here resolve the present status of such a rule. Nor need we reach the potential constitutional issues which may inhere in state involvement in racetrack operations of this Commonwealth. As the appellant argues, the Act of July 24, 1970, P. L. (Act No. 210), *amending* the Act of December 11, 1967, P. L. 707, 15 P.S. §2662.1, empowers the State Horse Racing Commission or a racing association to "refuse admission to and eject from [the] enclosure of the racetrack operated by any association, any person *whose presence there is, in the sole judgment of the State Horse Racing Commission or the association, inconsistent with the orderly or proper conduct of a race meeting or whose presence or conduct is deemed detrimental to the best interest of horse racing.* The action of the State Horse Racing Commission or any association in refusing any person admission to or ejecting him from a race meeting ground or enclosure shall be reviewable by the Court of Common Pleas of Dauphin County [now the Commonwealth Court of Pennsylvania, through the Appellate Court Jurisdiction Act of July 31, 1970, P. L. 673, 17 P.S. §211.508(a)(113)] as provided in the act of June 4, 1945 (P. L. 1388) [71 P.S. §1710.31], known as the 'Administrative Agency Law.'" (Emphasis added.) This section clearly abrogates the common law doctrine permitting the ejection of patrons without cause. The Association argues, of course, that the doctrine is nullified only where the ejection results from conduct inconsistent or detrimental to horse racing, leaving the doctrine intact where the ejection is for any other cause, or, as is the case here, for no cause at all. No reasonable construction of this sec-

tion, however, could support this claim, for it is presumed that "the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." Statutory Construction Act of 1972, 1 Pa. C.S. §1922(1). The Association's interpretation of the statute would place upon the ejected patron the burden of proving that he has been ejected for the reasons enumerated in the statute, and only then could he avail himself of the review procedure. At that point, obviously, he would have already proved the case against himself, and such a review would be useless. It is also obvious that, if the claimant did not satisfy his burden, no review would be available and the ejection would stand. To avoid this Catch-22 logic, we must conclude that the statute allows a patron to be refused admission or to be ejected from a racetrack *only if* that person's presence or conduct is inconsistent with a race meeting or detrimental to the best interests of horse racing. Any action, therefore, which results in the refused admission or ejection of a patron, is subject to the Administrative Agency Law review process as provided in the statute, so as to make certain that the right of ejection specified in the statute has been properly exercised.

The Association questions the applicability of Administrative Agency Law review procedures to actions taken by the Association, admittedly a non-governmental body. The statute here in question, however, merely designates that the review procedure shall be in accord with Administrative Agency Law; it does not require or indicate that the associations covered by the statute are or need to be governmental agencies in fact.

The Association clearly did not provide Ms. Rockwell with an opportunity to be heard, as mandated by the Administrative Agency Law, before she was ejected and permanently barred from the racetrack grounds. We find it necessary, therefore to remand this action

to the Continental Thoroughbred Racing Association and to issue the following

## ORDER

The above action is hereby remanded to the Continental Racing Association, Inc. for a hearing and an adjudication with findings of fact and supporting reasons in accordance with procedures described in the Administrative Agency Law, Act of June 4, 1945, P. L. 1388, 71 P.S. §1710.1 et seq.

Judge CRUMLISH, JR. concurs in the result only.